UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NCS PEARSON, INC.,

    Plaintiff,

vs.

Case No. 04-70467

HONORABLE JOHN CORBETT O'MEARA
HONORABLE STEVEN D. PEPE

MCGRATH & ASSOCIATES, INC.

    Defendant,
_____/

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION TO COMPEL EDWARD MCGRATH AND POLINA KORNILOVA TO REAPPEAR AND ANSWER DEPOSITION QUESTIONS (#46)

Plaintiff filed its motion (#46) seeking to compel Edward McGrath and Polina Kornilova to reappear for deposition on January 13, 2006, alleging that these deponents had improperly invoked their Fifth Amendment privilege against self-incrimination in refusing to answer questions during their September 2005 depositions (Dkt. #46, pp. 11-12). This motion was referred to the undersigned pursuant to 28 U.S.C. 636 (b)(1)(A) for a hearing and determination.

An in-person hearing was held on April 3, 2006. The matter was taken under advisement and the parties were allowed to submit supplemental briefs on the issue of the proper standard in this Circuit for invoking ones Fifth Amendment privilege in a civil matter. Both parties have now submitted their supplemental. For the reasons stated on the record and below, Plaintiff's motion is DENIED.

**I.  FACTUAL BACKGROUND**

Plaintiff filed this action on February 10, 2004. MAI was served with the summons and complaint on multiple occasions in early 2004 and a default judgment was entered on July 18, 2005, upon MAI's failure to answer the complaint.

This action arises out of a business relationship between McGrath & Associates, Inc. (MAI) and a division of Plaintiff's business known as Virtual University Enterprises (VUE), which provided a network of computer testing services to various other companies. VUE contracted with MAI to operate as part of its computer testing network and, to this end, the two entities entered into a VUE Testing Center Agreement.

Plaintiff alleges that the agreement between VUE and MAI permitted MAI limited access to a database of testing candidates. According to Plaintiff, the restrictions imposed upon MAI's use of the database limited it to viewing a maximum of five candidate profiles at a time and only for the purpose of administering VUE approved tests.

The agreement between VUE and MAI continued from December 18, 2000, until June 3, 2003, at which time VUE was advised that MAI was changing its company name to Certified Bootcamp, Inc. (Certified Bootcamp). As result, VUE required MAI to complete a Change of Commercial Name form to reflect the new company name (*See* Dkt. # 51, Exhibit 1). On this form, Polina Kornilova is listed as the only contact person for Certified Bootcamp.

Plaintiff alleges that MAI/McGrath sold "certain computer equipment" to Certified Bootcamp as "an act of fraud designed to evade" the Court's order that MAI produce and prevent VUE from recovering confidential materials taken from it. Plaintiff maintains that, while Certified Bootcamp is a separate legal entity from MAI, with Ms. Kornilova acting as the registered agent, the two companies are, in actuality, the same company. Plaintiff alleges that Certified Bootcamp used the same site identification as MAI until VUE shut the site down.

According to Plaintiff, on January 30, 2004, seven months after the name change, MAI, now acting as Certified Bootcamp, circumvented the security measures and restrictions VUE had placed

on its database and wrongfully gained access to 211,364 candidate records. Plaintiff further alleges that once VUE detected this security breach, it implemented counter measures and thwarted another nine attempts by MAI/Certified Bootcamp to gain unauthorized access to the database. According to Plaintiff, the individual at MAI who made all the unauthorized attempts to access VUE's database used the username "polina20" (Dkt. #1, ¶ 24).

Ms. Kornilova alleges that, in addition to filing the aforementioned Complaint For Injunctive Relief and Money Damages against MAI, Plaintiff reported the alleged unauthorized access of VUE's database to the Federal Bureau of Investigation, thus prompting a criminal investigation. Prior to Ms. Kornilova's deposition a FBI Special Agent advised Ms. Kornilova's counsel that the FBI was investigating whether the unauthorized access of VUE's database by MAI and/or Certified Bootcamp constituted a criminal violation pursuant to 18 U.S.C. §1030 (Fraud and Related Activity in Connection with Computers) and/or 18 U.S.C. §1037 (Fraud and Related Activity in Connection with Electronic Mail) (Dkt. #51, p. 5). Ms. Kornilova's counsel was further advised that both Ms. Kornilova and Edward McGrath, president of MAI, were targets of the criminal investigation.

On March 5, 2004, at a hearing on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, Judge O'Meara granted Plaintiff leave to depose Polina Kornilova (registered agent for Certified Bootcamp) and Edward McGrath (president of MAI). Ms. Kornilova, a non-party to this action, alleges that she had no notice of the preliminary injunction hearing and, therefore, was not present. Plaintiff thereafter served Ms. Kornilova with a subpoena to appear for a deposition. Ms. Kornilova, through her counsel, contacted Plaintiff and advised that she would submit to a deposition, but suggested that she be deposed by way of written questions pursuant to Fed. R. Civ. P. 31. She advised Plaintiff that because the instant civil case and the federal criminal

3

investigation are identical in scope and aim, Ms. Kornilova would likely assert her Fifth Amendment privilege to all relevant questions, therefore making it a waste of resources to require Ms. Kornilova to fly from Florida, where she resides, to attend a deposition where she would likely not answer any questions. Plaintiff rejected this suggestion and filed a Motion For Order To Show Cause Why Polina Kornilova Should Not Be Held In Contempt And To Compel The Deposition Duces Tecum of Polina Kornilova. While the Court did not hold Ms. Kornilova in contempt, it did order Ms. Kornilova to appear for a deposition. With respect to the issue of self-incrimination the Court held "it's very clear that the two nonparty persons who have been subpoenaed for depositions [Ms. Kornilova and Mr. McGrath], and are represented here, must appear and be sworn in for a deposition. If they want at that point under questioning to assert their rights under the Fifth Amendment, of course they can do so" (Dkt. # 51, Exhibit 2).

On September 22, 2005, Ms. Kornilova appeared for deposition and asserted her Fifth Amendment privilege in refusing to answer "all substantive questions that were relevant to the allegations contained in Plaintiff's complaint, as the answers to those questions could have furnished a link in the chain of evidence needed to prosecute her for the aforementioned crimes" (Dkt. # 51, p. 6).

In support of its motion Plaintiff provided a letter from a Victim Specialist of the FBI advising that the FBI had closed the investigation into Case Number 288A-DE-96445, which is presumably the aforementioned investigation of Mr. McGrath and Ms. Kornilova (Dkt. # 46, Exhibit 30. This letter is dated November 12, 2005, a month and a half after the relevant depositions.

It is undisputed that Ms. Kornilova and Mr. McGrath appeared for their depostions pursuant to Judge O'Meara's order, but asserted the Fifth Amendment in response to many questions (Mr.

4

McGrath alleges that 537 questions were asked and he refused to answer 202 and answered 235). Plaintiff argues that theses deponents should be required to answer all questions due to the FBI letter stating that the investigation is closed. Plaintiff further alleges that some of the questions asked could not implicate the witnesses criminally and should be answered regardless (Dkt. # 46, Appendices A and B lists questions that fall into this category). Finally, Plaintiff alleges that the witnesses should be held in contempt of court and inferences drawn from their failure to answer (*see* Dkt. # 46, p. 18)- including the inference that they violated Judge O'Meara's preliminary injunction which required:

> (e) - (h)  MAI to allow access to its sites and its equipment, turn over software, allow electronic imaging and provide a certification that it had complied;[1]
>
> (j), (k)  MAI to turn over any software the Plaintiff had provided to it and certify that it had turned everything over;[2] and
>
> (c), (d) refrain from destroying evidence and required MAI to read, download, copying, use, etc. information from Plaintiff's database.[3]

## II.     Legal Analysis

### A.     Proper Invocation of Fifth Amendment

Plaintiff questioned whether the deponents properly invoked their Fifth Amendment right to refuse to testify. In the briefings prior to the April 3, 2006, hearing Ms. Kornilova and Mr. McGrath relied upon the standard for proper invocation of the Fifth Amendment stated in *Murphy*

---

[1]MAI alleges it has complied with these provisions (Dkt. # 53, pp. 17-18). Plaintiff says the documents produced only go up to 2001 and contain very little for 2001 (Dkt. # 46, p. 9).

[2]MAI alleges that it has complied (Dkt. # 53, pp. 18-19). Plaintiff alleges the certification did not track the language of the Preliminary Injunction and is, therefore, inadequate (Dkt. # 46, pp . 7-8).

[3]MAI argues that there is no evidence that it failed to comply (Dkt. #53, pp. 20-21).

*v. Waterfront Commission*, 378 U.S. 52, 94 (1964):

> The privilege can be claimed in any proceeding, be it criminal or civil, administrative or judicial, investigatory or adjudicatory. ... it protects any disclosures which the witness may reasonably apprehend could be used in a criminal prosecution or which could lead to other evidence that might be so used.

*Id.*; *see also Malloy v. Hogan*, 378 U.S. 1 (1964); *McCarthy v. Arndstein*, 266 U.S. 34, 40 (1924).

> The deponents pointed out that this privilege not only extends:
>
> 'to answers that would in themselves support a conviction ... but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant.' *Hoffman* [*v. U.S.*], 341 U.S. [479], at 486, 71 S.Ct. 814 [(1951)]. '[I]t need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.' *Id.,* at 486-487, 71 S.Ct. 814.

*Ohio v. Reiner*, 532 U.S. 17, 20-21 (2001).

At the April 3, 2006, hearing the undersigned reviewed with the parties the disputed questions the deponents had refused to answer (as listed by Plaintiff in Dkt. #46, Appendices A & B) and determined that answers to these questions could be incriminating or at least serve as a link in the chain of evidence in a criminal investigation – especially because the same elements are necessary to find the Defendant liable under the civil provisions and the deponents guilty under the criminal provisions of the statutes at issue. Plaintiff was given an additional 2 weeks to submit a brief on the issue of the proper invocation of the Fifth Amendment privilege.

In Plaintiff's supplemental brief it relies on *In re Morganroth* in arguing that the deponents were required to show more than the mere possibility of prosecution in order to invoke the privilege (Dkt. #59, p. 7, citing *In re Morganroth*, 718 F.2d 161, 167 (6th Cir. 1983)).

While it is true that the *Morganroth* Court held that "[a] witness must, however, show a 'real danger,' and not a mere imaginary, remote or speculative possibility of prosecution", the Court went on to follow the *Hoffman* reasoning and held that:

> A witness risks a real danger of prosecution if an answer to a question, on its face, calls for the admission of a crime or requires that the witness supply evidence of a necessary element of a crime or furnishes a link in the chain of evidence needed to prosecute. In *Hoffman,* the Supreme Court held that a real danger of prosecution also exists where questions, which appear on their face to call only for innocent answers, are dangerous in light of other facts already developed. In such a situation a witness bears no further burden of establishing a reasonable cause to fear prosecution beyond asserting the privilege and identifying the nature of the criminal charge or supplying sufficient facts so that a particular criminal charge can reasonably be identified by the court. *The witness has met his burden and the court does not need to inquire further as to the validity of the assertion of the privilege, if it is evident from the implications of a question, in the setting in which it is asked, that a responsive answer might be dangerous to the witness because an injurious disclosure could result. Id.* 486-87, 71 S.Ct. 818-819. In appraising the claim, the court "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence." *Id.* 487, 71 S.Ct. 818; *Malloy v. Hogan,* 378 U.S. 1, 34, 84 S.Ct. 1489, 1507, 12 L.Ed.2d 653 (1964) (White, J., dissenting); *United States v. Moreno,* 536 F.2d 1042, 1047 (5th Cir.1976); *Klein v. Smith,* 559 F.2d 189, 200 (2d Cir.1977), *cert. denied,*434 U.S. 987, 98 S.Ct. 617, 54 L.Ed.2d 482 (1977).

*In re Morganroth*, 718 F.2d at167 (emphasis added)(some citations omitted).

In the present case it is undisputed that the deponents invoked their Fifth Amendment privilege out of fear of prosecution under 18 U.S.C. §1030 and 18 U.S.C. §2701, the same statutes that form the basis of Defendant's civil liability in this matter. Further, it is undisputed that the FBI had investigated the possibility of charging the deponents pursuant to these statutes with regard to the same actions that form the basis of this civil suit against Defendant. The letter supplied by Plaintiff from the FBI explaining that the investigation is closed is not a sufficient barrier to prosecution to revoke the deponents' Fifth Amendment privilege. The letter does not guarantee that the investigation will not be reopened upon the receipt of further information and does not provide the deponents with immunity from prosecution. Further, the standard articulated in *Morganroth*, though arguably semantically different from that cited by the deponents before the April 3, 2006, hearing, does not change the undersigned's analysis of the deposition questions at issue because, for

the reasons stated on the record, it is evident from the implications of the questions asked, in the setting in which they are asked, that a responsive answer might be dangerous to the deponents because an injurious disclosure could result.  Therefore, the court does not need to inquire further as to the validity of the assertion of the privilege and the deponents shall not be required to be redeposed.

Furthermore, it should be noted that neither deponent is a party to this action – only MAI is a named defendant.  To the extent Ms. Kornilova and/or Mr. McGrath were deposed as representatives of their respective companies, there are limits to the expected testimony.

> It is settled that a corporation is not protected by the constitutional privilege against self-incrimination and a corporate officer may not withhold testimony or documents on the ground that his corporation would be incriminated.  Nor may the custodian of corporate books or records withhold them on the ground that he personally might be incriminated by their production.  Even after the dissolution of a corporation and the transfer of its books to individual stockholders, the transferees may not invoke their privilege with respect to the former corporate records.
> ....
> 'But individuals, when acting as representatives of a collective group, cannot be said to be exercising their personal rights and duties nor to be entitled to their purely personal privileges. Rather they assume the rights, duties and privileges of the artificial entity or association of which they are agents or officers and they are bound by its obligations. In their official capacity, therefore, they have no privilege against self-incrimination. And the official records and documents of the organization that are held by them in a representative rather than in a personal capacity cannot be the subject of the personal privilege against self-incrimination, even though production of the papers might tend to incriminate them personally.'

*Curcio v. United States*, 354 U.S. 118, 122-128 (1957).

Yet this representative duty does not extend to oral testimony regarding documents produced subject to discovery, or even the failure to produce documents.  *Id.*  Though it is true that a

8

"corporate officer who has been required by subpoena to produce corporate documents *may*[4] *a*lso be required, by oral testimony, to identify them [because] [t]he custodian's act of producing books or records in response to a subpoena duces tecum is itself a representation that the documents produced are those demanded by the subpoena. Requiring the custodian to identify or authenticate the documents for admission in evidence merely makes explicit what is implicit in the production itself. The custodian is subjected to little, if any, further danger of incrimination." *Id.* However, in the instant case, as the Government did in *Curcio*, Plaintiff is seeking to compel the deponents to do more than identify documents already produced. It seeks to compel disclosure, by oral testimony, the whereabouts of items and records which it believes were not produced and information regarding whether the individuals were aware of and complied with this Court's Preliminary Injunction.[5] "Answers to such questions are more than 'auxiliary to the production' of unprivileged corporate or association records." *Id.* Therefore, the requested testimony cannot be compelled.

**B.    Adverse Consequences Due to Assertion of Fifth Amendment Privilege**

In its motion Plaintiff asked that, if the deponents were not made to reappear and answer

---

[4]The duty to orally authenticate or even submit documents where the company in question is a sole proprietorship, such that producing and/or testifying regarding the nature and scope of the documents could serve as evidence in a criminal proceeding that one also created the documents in question. *In re Custodian of Records of Variety Distributing, Inc.*, 927 F.2d 244 (6th Cir.1991)("We leave open the question whether the agency rationale supports compelling a custodian to produce corporate records when the custodian is able to establish, by showing for example that he is the sole employee and officer of the corporation, that the jury would inevitably conclude that he produced the records. [*Braswell v. U.S.*] 108 S.Ct. at 2295 n. 11.")

[5]Ms. Kornilova testified that she did not have the documents that were subpeoned from Certified Bootcamp (Dkt. #46, Exhibit Y, p. 4) and Mr. McGrath testified that the certification regarding the documents produced from MAI was accurate (*Id.* at Exhibit Z, p. 14).

9

Plaintiff's deposition questions, adverse inferences be drawn from the deponents' assertion of their Fifth Amendment privilege. Plaintiff argued that because liability had conclusively been decided in this matter upon the granting of the default judgement against MAI, the only remaining issues were the calculation of damages and whether MAI and "its representatives, agents, employees and those acting concert therewith" had complied with this Court's Preliminary Injunction (Dkt. # 46, pp. 11-12). The deponent's refusal to answer Plaintiff's deposition questions, Plaintiff argued, should lead to an inference that MAI and the deponents had not complied with the Preliminary Injunction and a resulting court order holding MAI and the deponents in contempt and awarding VUE damages and attorneys fees and costs.

The cases cited by Plaintiff support the argument that the Fifth Amendment does not forbid the use of adverse inferences against a *party* to a civil action that refuses to testify *in response to probative evidence offered against them*". *Baxter v . Palmigiano*, 425 U.S. 308, 318 (1976). Thus, as long as there is independent evidence to support the negative inferences beyond the invocation of the privilege against self-incrimination, inferences can be drawn. *See United States v. Local 560 of the Int'l Bhd. of Teamsters, etc.,* 780 F.2d 267, 292, n. 32 (3d Cir.1985), *cert. denied,* 476 U.S. 1140 (1986); *U.S. v. Stelmokas*, 100 F.3d 302, 311 (3d Cir. 1996). And, while not cited by Plaintiff, there is caselaw to support the use of a non-party witness's invocation of the Fifth Amendment in allowing an inference of guilt against a defendant under proper circumstances. *Davis v. Mutual Life Ins. Co. of New York*, 6 F.3d 367, 384-385 (6th Cir. 1993)("I see no reason to distinguish a party's invocation of the privilege from that of a non-party witness, since the inference to be drawn in either

10

case runs against the defendant").[6]

Yet there is no support for Plaintiff's arguments, which appear to be that a witness' refusal to testify on Fifth Amendment grounds can be used (a) against *the witness* to prove the truth of the matter asserted in the individual question the witness refuses to answer and (b) against the defendant to preclude it from presenting any other evidence on an issue.

In support of its argument that Ms. Kornilova and Mr. McGrath can be considered employees of MAI and therefore subject to the Preliminary Injunction Plaintiff relies upon the fact that the deponents invoked their Fifth Amendment privilege and refused to testify whether they had ever been employed by MAI (Dkt. # 46, p. 29). Federal Rule of Civil Procedure 65(d) governs the scope of a preliminary injunction issued by a federal court. It provides that an injunction, is binding only upon the "parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Fed. R. Civ. P. 65(d). Further, it is well established that a preliminary injunction order is binding upon the employees of a named party. *Baltimore & O.R. Co. v. Chicago River & Indiana R. Co.,* 170 F.2d 654, 659 (7th Cir.1948), *cert. denied,* 336 U.S. 944 (1949). The Preliminary Injunction in this matter was issued in conformance with Fed. R. Civ. P. 65(d) and expressly states that employees of MAI are bound by its terms.

Plaintiff argues that because the deponents refused to answer questions regarding the location

---

[6] The *Davis* case involved a fraudulent tax and insurance case. The *Davis* Court allowed a jury to impute to a defendant an inference of guilt from two employee's refusal to testify, where there was a great deal of evidence that one witness was a central figure in the defendant's organization and had worked for the defendant for many years and had not only actually sold life insurance to each plaintiff on the defendant's behalf, but was also the individual who referred the plaintiffs to defendant's tax preparation services. The other witness "was more peripherally involved in [the defendant's] operation, [but] was another employee repeatedly mentioned during the trial." *Davis*, 6 F.3d 367 at 384-85.

of MAI's equipment and documents, the veracity of the certification and compliance with the Preliminary Injunction, it should be inferred that MAI and Certified Bootcamp are one entity and the deponents violated the Preliminary Injunction by preventing VUE from accessing the computer equipment, withholding documents and falsifying the certification (Dkt. # 46, p. 29).

With regard to the veracity of the certification this argument is without merit. Only MAI was required to complete a certification of compliance with the Preliminary Injunction, Ms. Kornilova was not questioned regarding the veracity of the certification and Mr. McGrath testified that he signed the certification on behalf of MAI and that it was accurate (Dkt. # 46, Exh. Z, p. 14). Therefore, neither deponent refused to testify regarding the veracity of the certification and no evidence was presented by Plaintiff that the certification is false.

With regard to Ms. Kornilova's compliance with the Preliminary Injunction, this argument requires an inference on top of an inference. First, as Plaintiff's requests, the court would have to infer that she worked for MAI based on her refusal to testify as to whether or not she worked for MAI,[7] then the court would have to infer that as an employee of MAI she violated the Preliminary Injunction. Yet, the deposition questions posed to Ms. Kornilova did not inquire as to her own actions. Ms. Kornilova was questioned regarding her knowledge of Mr. McGrath and MAI's compliance with the Preliminary Injunction:

Excerpt from Ms. Kornilova's deposition:

**Q –** There's also a preliminary injunction that was entered on March 12 of 2004, signed by Judge O'Meara. Let me show you a copy of the injunction. ....
....
**Q –** .... In that injunction, McGrath is prevented from modifying any software, correct?

---

[7]Alternatively, the court could infer that she worked for MAI by inferring that Certified Bootcamp, for whom she is listed as the "on-site technical/installation contact" in the Change in Commercial Name Form submitted by MAI on June 3, 2003, and MAI are the same entity.

.... [objection and resulting discussion]
   Do you see those words on this piece of paper?
**A –** Yes.
**Q –** All right. Has Mr. McGrath complied with that?
**A –** On advice of my attorney, I assert my Fifth Amendment privilege.
**Q –** .... Do you know if McGrath has distributed any materials or information from my client's database since this Order was entered in March '04?
**A –** On advice of my attorney, I assert my Fifth Amendment privilege.
**Q –** Do you know if McGrath has destroyed any computers or equipment or data since the entry of this Order in March '04?
**A –** On advice of my attorney, I assert my Fifth Amendment privilege.
**Q –** Do you know if McGrath has in his possession any copies of data or information stored electronically that he received from my client?
**A –** On advice of my attorney, I assert my Fifth Amendment privilege.
**Q –** Do you know if anyone acting on his behalf has any of that information in their possession?
**A –** On advice of my attorney, I assert my Fifth Amendment privilege.
**Q –** Do you now if McGrath and Associates have kept copies of any software provided to them by my client?
**A –** On advice of my attorney, I assert my Fifth Amendment privilege.

(Dkt. #46, Exhibit X, p. 9-10).

Her refusal to testify regarding her knowledge of whether MAI and/or Mr. McGrath preserved evidence and/or complied with the Preliminary Injunction is insufficient to allow an inference that she herself violated the Preliminary Injunction for three reasons. First, as stated above, Ms. Kornilova was not questioned about her own actions in relation to the Preliminary Injunction, therefore there is nothing on which to draw an inference of her non-compliance.[8] Second, Plaintiff has provided the court with insufficient facts to lay a foundation on which to rely in making an inference that Ms. Kornilova had knowledge of the actions of Mr. McGrath or MAI, such that her silence might have led to an inference that she was aware of improper actions on their

---

[8]Even if Ms. Kornilova had been questioned regarding her own actions it is likely that she would have refused to answer these questions because to do otherwise might provide information about her relationship with Defendant. Therefore, absent other evidence to support a conclusion that she had violated the Preliminary Injunction, the court would still be unable to make an inference that she had done so.

13

part after the entry of the Preliminary Injunction.  Fed. R. Civ. P. 602; *U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*,  415 F.Supp.2d 628, 634 (E.D.Va. 2006)("Because a witness may only testify as to matters for which they possess 'personal knowledge,' any adverse inference drawn from [] testimonial silence requires finding that [the witness] had personal knowledge of the subject about which he refuses to testify.").  18 U.S.C. §1037 includes a conspiracy provision, therefore it is just as likely, absent other probative evidence, that Ms. Kornilova refused to testify to prevent the development of evidence  regarding her relationship with MAI and Mr. McGrath that would be necessary to convict her of conspiracy under this statute.  Last, Plaintiff has provided the court with insufficient facts to lay a foundation on which to rely in making a inference that Mr. McGrath or MAI violated the Preliminary Injunction such that an inference could be drawn that Ms. Kornilova, due to her inferred relationship with MAI and Mr. McGrath could be inferred to have violated the Preliminary Injunction.  *See Doe v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir.2000) ("[T]he key to the Baxter holding is that such adverse inference can only be drawn when independent evidence exists of the fact to which the party refuses to answer.").  Therefore, Ms. Kornilova cannot be found guilty of violating the Preliminary Injunction under these facts.

Mr. McGrath was the president of MAI, and, therefore, subject to the Preliminary Injunction.  Yet, Plaintiff has not provided this court with any evidence that Mr. McGrath violated the Preliminary Injunction other than his refusal to testify on the subject.  Therefore, it also cannot be inferred that Mr. McGrath violated the Preliminary Injunction.

As to inferring a damages amount or barring MAI from presenting evidence regarding damages due to the refusal of the deponents to testify, this matter is better left to be decided in a motion in limine before trial and after discovery had been completed.  At that time the court could

consider the Plaintiff's complete damages claim and consider the admissibility of Defendant's rebuttal evidence in light of the deponents' refusal to testify. Further, as stated above, a witness's refusal to testify can result in an inference of guilt being raised against a defendant under proper circumstances. Yet, there is no support for precluding a defendant from presenting evidence to refute a plaintiff's damages claim due to a non-party witness's refusal to testify on the subject (though the parties dispute whether the questions asked of the deponents actually dealt with damages) – especially not before the parties complete discovery and examine the documents/information that is produced and present their arguments that these documents/information do or do not provide enough information to calculate/extrapolate damages. The cases cited by Plaintiff stand for the proposition that a *party* may lose its right to present evidence on an issue on which *it* refused to testify. Though MAI appears to have been owned and operated solely by Mr. McGrath, and Mr. McGrath has refused to provide oral testimony to most of Plaintiff's substantive questions, MAI has produced documents in response to Plaintiff's discovery requests. It remains to be seen whether Plaintiff can calculate/extrapolate damages based on these documents and its own information, and whether MAI can refute the damages claim, if at all, with documentary evidence, given that its principle will not testify. Yet, based on its certification, MAI has complied with Plaintiff's document request and, therefore, on the current facts of the litigation, is not precluded from introducing evidence of damages due to the deponents' refusal to testify.

Dated: May 31, 2006                                             s/Steven D. Pepe
Ann Arbor, Michigan                                             United States Magistrate Judge

<u>Certificate of Service</u>

I hereby certify that a copy of this Order was served upon the attorneys of record by electronic means on May 31, 2006.

<u>s/William J. Barkholz</u>
Courtroom Deputy Clerk